Ivan Y. Nickerson v. Commissioner. Estate of Morton R. Creesy, Deceased, Frank B. Wallis and William N. Creesy, Executors, and Mora N. Creesy v. Commissioner. Lawrence C. Nickerson and Eva M. Nickerson v. Commissioner. Lawrence C. Nickerson v. Commissioner.
Nickerson v. Commissioner
Docket Nos. 70758, 73387, 75173, 75174.
United States Tax Court
T.C. Memo 1960-270; 1960 Tax Ct. Memo LEXIS 20; 19 T.C.M. (CCH) 1508; T.C.M. (RIA) 60270; December 14, 1960
Robert B. Fraser, Esq., and William Bruce King, Esq., for the petitioners. Douglas D. Robertson, Esq., and Manning K. Leiter, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined deficiencies in the income tax of the petitioners as follows for the indicated years: Petitioner
Dkt. No.
Year
Deficiency
Ivan Y. Nickerson
70758
1954
$780.37
1955
838.42
Estate of Morton R. Creesy, Deceased, Frank B.
Wallis and William N. Creesy, Executors, and
Mora N. Creesy
73387
1954
749.00
1955
684.00
1956
529.00
Lawrence C. Nickerson and Eva M. Nickerson
75173
1956
418.96
Lawrence C. Nickerson
75174
1955
615.85
*21 In his answer in the case of Lawrence C. Nickerson, Docket No. 75174, the respondent alleged that the return for 1955 was not filed within the time prescribed by law and requested an increase of $30.79 in the deficiency as representing an addition to tax under section 6651 of the Code of 1954. However, on brief the respondent waived the request. The only issue for decision is the correctness of the respondent's determination that certain payments made by Nickerson Lumber Company to Ivan Y. Nickerson during 1954 and 1955, to Mora N. Creesy during 1954, 1955, and 1956, and to Lawrence C. Nickerson during 1955 and 1956 constituted taxable income. Findings of Fact Some of the facts have been stipulated and are so found. Ivan Y. Nickerson, whose residence at all times material herein was Marblehead, Massachusetts, filed his Federal income tax returns for the calendar years 1954 and 1955 with the district director for the district of Massachusetts. Mora N. Creesy, whose residence at all times material herein was Marblehead, Massachusetts, together with her husband Morton R. Creesy, filed joint Federal income tax returns for the calendar years 1954, 1955, and 1956 with the district *22 director for the district of Massachusetts. Morton R. Creesy died testate on August 29, 1957, and Frank B. Wallis and William N. Creesy, who are the duly appointed executors under his will, are involved herein solely by reason of Morton having joined with Mora, his wife, in the joint income tax returns for 1954, 1955, and 1956. Lawrence C. Nickerson, whose residence at all times material herein was Boston, Massachusetts, filed his Federal income tax return for the calendar year 1955 and together with his wife Eva M. Nickerson filed a joint Federal income tax return for 1956 with the district director for the district of Massachusetts. Eva is involved herein solely by virtue of her participation in such joint return. Ivan, Lawrence, and Mora, together with Joshua A. Nickerson and Ernest C. Nickerson, are the children of Oscar C. Nickerson, late of Chatham, Massachusetts, who died testate and a widower on January 19, 1954, and who is sometimes hereinafter referred to as the decedent. At the time of the death of the decedent each of his five children was an adult. In 1895 the decedent, as sole proprietor, began the business of selling lumber and building materials in Orleans, Massachusetts. *23 He operated under the name of Oscar C. Nickerson until about 1916 when he purchased the business of a competitor and thereafter operated under the name of Nickerson Lumber & Supply Company. In 1920 the decedent caused Nickerson Lumber Company, a Massachusetts corporation, sometimes hereinafter referred to as the corporation, with its principal place of business in Orleans, Massachusetts, to be organized and it took over and conducted the lumber and building materials business theretofore carried on by him. The decedent was the corporation's first president and he served in that capacity until 1951 or 1952. Subsequently and until his death he continued in the service of the corporation and actively participated in the conduct of its affairs. He was a director of the corporation at the time of his death. The financial success of the corporation during the time the decedent was president was due in a large measure to the efforts of the decedent. In 1922 Joshua entered the full-time employment of the corporation and has continued so at all times since. For many years he was clerk of the corporation and continued in that capacity until 1959. About 1951 or 1952, he became president of *24 the corporation and has continued in that capacity. Also he is and for many years has been treasurer of the corporation. As compensation for his services in the respective years, the corporation paid Joshua $23,000 in 1953, $25,000 in 1954, and $24,000 in 1955. Ivan and Lawrence have never been directors, officers or employees of the corporation. Mora has never been an officer or employee of the corporation but during the taxable years involved herein and for many years prior thereto she was a director. The directors of the corporation in 1951, after having reviewed the history and progress of the corporation, began formulating plans and took the initial steps toward carrying out an expansion and capital improvement program. By 1954 a decision had been made as to what should be done in effectuating the program and during the taxable years involved herein the program was carried out. The corporation's available cash was insufficient to carry out the program. Consequently, loans in substantial amounts subsequently were obtained for that purpose. In 1934 and continuing throughout the taxable years here involved, the issued and outstanding capital stock of the corporation consisted *25 of 730 shares of a single class of common stock. On December 28, 1934, the decedent owned 455 of the shares and Joshua owned the remaining 275 shares. On December 28, 1934, the Nickerson Lumber Company Management Trust, sometimes hereinafter referred to as the trust, was created with the decedent, Joshua, and Lawrence as the trustees, and decedent and Joshua transferred all of their stock in the corporation, 455 shares and 275 shares, respectively, to the trust. Prior to 1954 Ernest replaced Lawrence as a trustee. The trust instrument provided, inter alia, that the shares transferred by each donor would be kept segregated; that such donor would receive the income from the stock transferred by him; and that no shares could be sold by the trustees without the unanimous approval of all of the trustees. The trust instrument further provided that the trust would terminate and expire upon the death of the decedent. Upon termination the 275 common shares transferred to the trust by Joshua would be returned to him, if living, and the 455 common shares transferred to the trust by the decedent would be distributed to decedent's executors, administrators, or assigns. An alternative disposition *26 of the 455 shares of common stock was provided in cash Joshua survived the decedent, as he did. Each beneficiary of the decedent's estate, except Joshua, who would otherwise be entitled to receive a part of the 455 common shares could elect to receive new preferred stock having an equal "fair value" instead of common stock. If any beneficiary, except Joshua, made such an election, the trustees were directed to delay distribution of all the common stock until the new preferred stock was issued, at which time the new preferred stock and any unconverted common stock would be distributed. In no event, however, was the distribution of stock to be delayed for longer than 12 months after the decedent's death. If the conversion of common into new preferred stock at the request of a beneficiary was not consummated within the 12-month period, all the common stock would be distributed and no conversion of common stock into preferred stock would be made. On December 28, 1934, the same day the trust was created, the decedent executed his will in which he bequeathed in equal shares to his children living at his death the 455 shares of common stock in the corporation, or the proceeds thereof, to *27 which his legal representatives would be entitled upon termination of the trust. Lawrence and Mora were named as executors in the will. In 1953 the decedent received from the corporation a "base" salary of $15,000 and an additional amount of $3,000. Prior to his death on January 19, 1954, the decedent had received one-twelfth of $15,000, or $1,250, as salary for the month of January 1954. On April 3, 1954, a meeting of the stockholders of the corporation was held at the residence of the decedent. The minutes of the meeting contain the following: There were present Joshua A. Nickerson and Ernest C. Nickerson, Trustees, representing all of the outstanding stock of the corporation. Also present by invitation were Mora N. Creesy, Lawrence C. Nickerson and Ivan Y. Nickerson; thus all of the children of the late Oscar C. Nickerson were present. * * *
RESOLVED, that we here record the death of our father, Oscar C. Nickerson, at Clearwater, Florida on January 19th., 1954 in the 88th. year of his life, and that in lieu of more formal resolutions we here and now acknowledge our great debt to him as a father and to him and our mother, Eglantine F. (Young) Nickerson, for their sacrifices *28 and efforts, particularly in the early years of this business which they began in 1895, which have redownded to our benefit. /s/ Lawrence C. Nickerson /s/ Mora N. Creesy /s/ Joshua A. Nickerson /s/ Ivan Y. Nickerson /s/ Ernest C. Nickerson At the meeting, Joshua, Mora, and Ernest were elected directors of the corporation. Immediately following the stockholders' meeting on April 3, 1954, a meeting of the directors of the corporation was held. Present at the meeting were Joshua, Mora, and Ernest who comprised all of the directors of the corporation. The minutes of the meeting contain the following: Upon motion duly made and seconded it was unanimously VOTED that since the salary of the late Oscar C. Nickerson has been paid only through the month of January 1954, therefore a total sum of $1,250.00 per month be paid in equal shares to each of his five children for a reasonable, limited period beginning with February 1954. Upon motion duly made and seconded, it was unanimously VOTED that the Treasurer is hereby authorized and instructed, under the foregoing vote, to pay to each of the five children of the late Oscar C. Nickerson (namely, Lawrence C. Nickerson, Mora *29 E. Creesy, Joshua A. Nickerson, Ivan Y. Nickerson, and Ernest C. Nickerson) $250.00 per month, retroactive to February 1, 1954, reserving the privilege to any child who may so choose to defer the actual receipt of any or all of his monthly shares until 1955; and the Treasurer is further instructed to continue such payments through the month of December 1954 (making eleven monthly payments in all under this vote), after which further consideration may be given to the subject by this board of Directors. At this meeting the salary of Joshua as president, treasurer, and clerk of the corporation was fixed at $15,000 annually. Pursuant to the above-quoted resolutions adopted by the directors of the corporation at their meeting on April 3, 1954, the corporation during 1954 made 11 monthly payments of $250 each to each of the five children of the decedent. This action by the directors was ratified by the trustees of the trust. At a meeting of the stockholders of the corporation held on February 5, 1955, Joshua, Mora, Ernest, and Kenneth E. Wilson, an attorney with an office in Hyannis, Massachusetts, were elected directors of the corporation. Immediately following the meeting of the *30 stockholders and on the same day, a meeting of the directors was held at which all four of the foregoing named directors were present. At their meeting the directors unanimously adopted the following resolution: VOTED, to continue through the year 1955 the payments to the heirs of Oscar C. Nickerson as stated in the meeting of the Directors, held on April 3, 1954, after which further consideration may be given to the subject by the Board of Directors. Pursuant to the foregoing quoted resolution adopted by the directors, the corporation during 1955 made 12 monthly payments of $250 each to each of the five children of the decedent. This action by the directors was ratified by the trustees of the trust. At a meeting of the stockholders of the corporation held on January 14, 1956, Joshua, Mora, Ernest, and Kenneth E. Wilson were elected directors of the corporation. At a meeting of the directors thereafter held on the same day, and at which Joshua, Ernest, and Kenneth E. Wilson were present, the following resolution was unanimously adopted: VOTED, to continue the payments to the heirs of Oscar C. Nickerson in accordance with action previously taken by the Directors by votes of *31 April 3, 1954 and February 5, 1955, until the next meeting of the Board of Directors at which time the subject is to be given further consideration. Pursuant to the foregoing resolution the corporation made payments of $250 each to each of the five children of the decedent for the first 8 months of 1956. This action by the directors was ratified by the trustees of the trust. At a meeting of the directors of the corporation held on August 22, 1956, and at which Joshua, Mora, Ernest, and Kenneth E. Wilson were present, the following resolution was unanimously adopted: VOTED that the payments to the heirs of Oscar C. Nickerson, as provided by the votes of the Board of Directors on April 3, 1954, February 5, 1955, and January 14, 1956, be terminated with the payment for August 1956. In accordance with the foregoing resolution the corporation made no payments to the children of the decedent after the payments made in August 1956. At the time of his death the decedent had been fully compensated by the corporation for all services he had rendered to it and it did not owe him any money with respect to any matter. Nor did it owe any money to any of the petitioners herein. Nor at the *32 time of the decedent's death was the corporation under any contractual obligation of any kind, whether arising out of any agreement with the decedent or with any of the petitioners herein, to make any of the payments here involved. Apart from the payments here in controversy, the corporation did not pay any dividends from its inception in 1920 through the taxable years here involved. The following is a statement of the corporation's net profit for the indicated years and its accumulated earnings and profits at the end of the respective years: Accumulated Earn-
ings and Profits
Year
Net Profit
as of December 31
1953
$31,489.77
$485,398.67
1954
40,916.28
526,314.95
1955
30,630.24
556,490.26
1956
Not shown
565,481.29 In computing net profit for the years 1954, 1955, and 1956 and for Federal income tax purposes the corporation deducted as business expenses the payments made to the decedent's children during those years. Following the death of the decedent and on an undisclosed date in 1954, his five children executed an agreement: to extend said twelve-month period [for distribution of the 455 shares of common stock in the corporation *33 transferred by decedent to the trust on December 28, 1934, and held by the trust at the time of decedent's death] which otherwise would expire on January 19, 1955, to January 1, 1958 * * * Other powers and duties of the trustees as set forth in the trust agreement of December 28, 1934, were continued in effect by the extension agreement. The extension agreement was executed by each of the decedent's children in his or her individual capacity. Also Ernest and Joshua signed as trustees of the trust and Mora and Lawrence signed as executors under the decedent's will. In 1957 a similar agreement was executed by all of the decedent's children. This agreement provided for an extension of the time limit for the distribution of the 455 shares of stock from January 1, 1958 to July 1, 1958. On January 7, 1958, the trustees, Joshua and Ernest, distributed all of the common shares of stock in the corporation held by the trust. Joshua, his wife, and his son received a total of 275 common shares, being the number of shares which Joshua originally transferred to the trust in 1934. The 455 shares transferred to the trust by the decedent were transferred to the executors under his will, Lawrence *34 and Mora. The executors immediately transferred 91 shares to each of the decedent's five children, including Joshua. On the same day, January 7, 1958, the corporation redeemed the 91 shares distributed to Lawrence, the 91 shares distributed to Ivan, 46 of the shares distributed to Mora, and 7 of the shares distributed to Ernest, thereby leaving ownership of the remaining 495 shares of the corporation's stock as follows: Shareholder
No. of Shares
Joshua
216
Joshua's wife
100
Joshua's son
50
Ernest
84
Mora
45
Total
495
In their income tax returns for the respective taxable years involved herein the petitioners showed the amounts received by them in such years from the corporation, variously stating that the amounts were a "gift" or a "gratuity," and included no portion of such amounts in the income reported on their returns. In determining the deficiencies the respondent determined that such amounts constituted taxable income and increased the taxable income of the petitioners accordingly. Opinion Taking the position that the payments made by the corporation to them during their respective taxable years involved herein were not made for any services *35 rendered to the corporation by any of them or by the decedent and were not dividends or in lieu of dividends, the petitioners contend that the payments were gifts made by the corporation motivated "by considerations of personal gratitude and affection towards the late Oscar C. Nickerson and by the interests of family solidarity and bringing Oscar's children more closely together." The respondent contends that the payments were not gifts but actually were disguised distributions of the earnings and profits of the corporation among all of its beneficial shareholders in a proportion that was satisfactory to them. In Estate of Mervin G. Pierpont, Deceased, 35 T.C. - (Oct. 19, 1960), we were called upon to determine whether certain payments made in 1956 by a corporation to the widow of one who at the time of his death had served the corporation as president and director for approximately 38 years were gifts and therefore excludable from gross income under the Internal Revenue Code of 1954, or constituted taxable income. In holding that the payments were not gifts we cited and relied on the recent case of Commissioner v. Duberstein, 363 U.S. 278, wherein the Supreme Court *36 clarified and developed the law as to what the guiding criteria should be in determining whether a transfer without consideration constitutes a gift and consequently is excludable from gross income under the Code. As we observed in the Pierpont case, the Supreme Court in the Duberstein case noted that a voluntary transfer without any consideration or compensation therefor, though a common-law gift, is not necessarily a gift within the applicable provision of the Code. Continuing the Supreme Court said (pp. 285-286): For the Court has shown that the mere absence of a legal or moral obligation to make such a payment does not establish that it is a gift. Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 730. And, importantly, if the payment proceeds primarily from "the constraining force of any moral or legal duty," or from "the incentive of anticipated benefit" of an economic nature, Bogardus v. Commissioner, 302 U.S. 34, 41, it is not a gift. And, conversely, "[where] the payment is in return for services rendered, it is irrelevant that the donor derives no economic benefit from it." Robertson v. United States, 343 U.S. 711, 714. A gift *37 in the statutory sense, on the other hand, proceeds from a "detached and disinterested generosity," Commissioner v. LoBue, 351 U.S. 243, 246; "out of affection, respect, admiration, charity or like impulses." Robertson v. United States, supra, at 714. And in this regard, the most critical consideration, as the Court was agreed in the leading case here, is the transferor's "intention." Bogardus v. Commissioner, 302 U.S. 34, 43. "What controls is the intention with which payment, however voluntary, has been made." Id., at 45 (dissenting opinion). The Supreme Court clearly pointed out in the Duberstein case that in ascertaining the intention of the donor, his description of the transaction cannot be determinative stating (p. 286): the Bogardus case itself makes it plain that the donor's characterization of his action is not determinative - that there must be an objective inquiry as to whether what is called a gift amounts to it in reality. 302 U.S., at 40. It scarcely needs adding that the parties' expectations or hopes as to the tax treatment of their conduct in themselves have nothing to do with the matter. * * *38 * We take it that the proper criterion, established by decision here, is one that inquires what the basic reason for his conduct was in fact - the dominant reason that explains his action in making the transfer. * * * We are here faced with the problem of ascertaining the donor's (corporation's) intention in the light of the criteria discussed in the Duberstein opinion. In seeking out that intention it must be observed that the burden of proof is upon the petitioners with the result that, to the extent that the record is incomplete, the Court is not warranted in indulging in conjectures in favor of the petitioners to fill the gap. The resolutions of the board of directors of the corporation of April 3, 1954, which initiated the payments in question, as well as those of February 5, 1955, and January 14, 1956, which merely authorized continuance of the payments, afford us little assistance. The first of the resolutions of April 3, 1954, merely recites that since the salary of the decedent had been paid only through the month of January 1954 - therefore a total sum of $1,250.00 per month [an amount equal to one-twelfth of the decedent's annual "base" salary of $15,000] be paid *39 in equal shares to each of his five children for a reasonable, limited period beginning with February 1954. The other resolution of April 3, 1954, authorized and instructed the corporation's treasurer to make the monthly payments retroactive to February 1, 1954, and continue them through December 1954, or a total of 11 payments during 1954. The language of the resolutions standing alone suggests the possibility of the existence at the time of the decedent's death of an arrangement between the corporation and the decedent or between the corporation and the decedent's children under which the corporation, in the event of decedent's death, was obligated to make for a reasonable limited period the monthly payments authorized. However, the evidence shows that no such an arrangement was in existence. The resolutions are devoid of any language which even remotely suggests that the authorization of the payments proceeded from a detached and disinterested generosity or that a reason, basic, dominant or otherwise, for the authorization was affection, respect, admiration, charity or like impulses for either the decedent or his five children. In this connection it is observed that the three *40 directors who "unanimously" adopted the resolutions of April 3, 1954, were children of the decedent, that each received $250 a month under the resolutions, and that the record does not contain any suggestion that any of the five children of the decedent was in need. It is true that Joshua A. Nickerson, one of the directors who adopted the resolution, testified in effect that the payments were authorized by the directors because they felt it would not be decent to do otherwise in view of the contributions and long service of the decedent to the corporation. In view of the fact that the decedent had bequeathed to his children in equal amounts all of the 455 shares of stock in the corporation which he had transferred to the trust and which under the terms of the trust instrument would be distributable by the trust not later than one year after the decedent's death, the import of Joshua's testimony is far from clear. Any payments made to the children prior to the time the stock was distributed to them would reduce the amount of the assets the corporation would have at the time of distribution of the stock and to that extent would tend to reduce the value of the stock at the time of distribution. *41 Further Joshua's testimony neither shows nor suggests any reason why, if the payments were gifts, as here contended, and not dividends, it was necessary for the directors to adopt resolutions in each of the years 1954, 1955, and 1956 authorizing the payments and take from April 3, 1954, when the payments were first authorized until August 22, 1956, when they were terminated, to decide what sum or sums should be paid by the corporation as gifts. At this point it is observed that after the decedent's death and on some undisclosed date in 1954, not shown to have been later than April 3, 1954, the five children of the decedent, in their individual capacities, joined with the trustees of the trust and the executors of decedent's will in executing an agreement by which the 455 shares of stock were continued in trust until January 1, 1958, at which time they were to become distributable by the trust. The effect of the agreement was to postpone distribution of the stock for a period of approximately 3 years. In 1957 a similar agreement was executed by all of the decedent's children. This agreement provided for an extension of the time limit for distribution of stock from January 1, 1958 to *42 July 1, 1958. Distribution of the stock to decedent's children was made in January 1958. The petitioners have not favored us with an explanation of the action of the children in 1954 in deferring distribution of the stock for a period of approximately 3 years beyond the time provided by the trust instrument and during which time the stock and the corporation would remain under the control of the trustees. In the absence of an explanation and in view of the situation presented, including the fact that Joshua in 1953 had received from the corporation $23,000 as compensation for his services to it during that year, we think it more reasonable to conclude that the dominant reason for the payments in question was to provide each of the decedent's children with income from the corporation during the period distribution of the stock was deferred, than to conclude that the dominant reason was the detached and independent generosity of the corporation flowing from its gratitude to and affection for the decedent and its appreciation of his contributions and long service to it. It is true that in August 1956 the directors of the corporation terminated payments beyond that month. However, the *43 petitioners have not favored us with any explanation of such action, coming as it did after payments had been made for 31 months nor is any explanation apparent from the record. Under the circumstances and in the absence of evidence to the contrary, we think it only reasonable to conclude that the termination of the payments, whatever may have been the reason therefor, was with the approval and consent of all of the decedent's children. From our consideration of the record we are of the opinion that petitioners have failed to show that the payments in controversy were intended as gifts. Inasmuch as the Supreme Court by its opinion in the Duberstein case has clarified the general subject of gifts, we have not found it profitable to discuss the numerous earlier decisions of the lower courts involving payments by an employer to the widow or children of a deceased employee. We think it is plain under the Supreme Court's opinion in the Duberstein case that there is no rule of law that provides an automatic answer in such cases and that each case must be decided upon its own record. Each such case is governed by its own facts as determined in the light of the principles set forth in *44 the Duberstein opinion. [1]
In support of their contention that the payments in question were not dividends, the petitioners first urge that because of the cash requirements of the corporation for working capital and for its improvement and expansion program during the taxable years in which the payments were made, 1954, 1955, and 1956, it would not have been prudent or the exercise of sound business judgment for the corporation to have abandoned its policy, followed since its inception in 1920, of not paying any dividends, and pay dividends during such years. The evidence shows that the corporation had an authorized capital stock of $75,000 consisting of 750 shares of a par value of $100 each, all of which were issued prior to the end of 1934, and that 20 of the shares were reacquired by the end of that year and thereafter were held as treasury stock. *45 As a result of the corporation's policy of not declaring any dividends, its accumulated earnings and profits at the end of 1953 were in excess of $485,000 and increased to an amount in excess of $565,000 by the end of 1956, even though the payments in question were deducted as business expenses in computing the corporation's earnings and profits for the years 1954, 1955, and 1956. In view of the foregoing and since the corporation actually made the payments in question and since the record fails to show that the corporation did not have and was not able to obtain all of the cash it required for working capital and for its improvement and expansion program, we are of the opinion that the contention of the petitioners is without merit. Taking the position that throughout the taxable years in question the trust, of which Joshua and Ernest were the trustees, was the sole stockholder of the corporation, the petitioners contend that the payments in question were not dividends because they were not paid by the corporation to the trust but were paid directly to the decedent's children. The petitioners also contend that the payments were not dividends because they were not made in proportion *46 to the beneficial interests of the decedent's children in the trust. Upon creation of the trust in 1934 the decedent and Joshua transferred all of their stock in the corporation, 455 shares and 275 shares, respectively, or a total of 730 shares, to the trust. The trust instrument provided that upon termination of the trust the 455 shares transferred by decedent should be distributed to his executors, administrators, or assigns, and that the 275 shares transferred by Joshua to the trust should be distributed to Joshua, if he then were living. By his will the decedent bequeathed the 455 shares, or the proceeds thereof, to which his executors or administrators might be entitled under the trust, in equal amounts to his children living at his death. Since all five of the petitioner's children were living at his death, each child, upon distribution of the decedent's estate, was entitled to receive 91 shares. Adding the 91 shares which Joshua was entitled to receive to the 255 shares which he had transferred to the trust and was entitled to receive back, gives a total of 366 shares or slightly more than one half of the total 730 shares in which Joshua had a beneficial interest, whereas *47 each of the other four children of the decedent had a beneficial interest in only 91 shares. Although such was the situation the evidence shows that Joshua as a director joined in adopting the resolution authorizing the payments in question, which were in equal amounts, to the decedent's five children. The evidence further shows that he as a trustee joined in ratifying the action of the directors in authorizing the payments. The only conclusion to be drawn from such acts of Joshua is that he desired the payments to be made in equal amounts to the five children even though disproportionate to his beneficial interest in the stock of the corporation and that he waived his right to require that they be made proportionally. The petitioners cite us to no law or decision and we know of none which required that Joshua do otherwise, despite his obvious desire. Since the corporation had ample accumulated earnings and profits out of which to make the payments in question and since the payments were made to persons who owned beneficial interests in the stock of the corporation, it is our opinion and we so hold that the payments constituted dividends and were taxable as such to the recipients *48 for taxable years in which received. The petitioners contend that if any part of the payments involved herein was taxable to them as dividends, they are entitled with respect thereto to the exclusion for dividends received and to the credit for dividends received provided in section 116 and section 34, respectively, of the Internal Revenue Code of 1954. Since we have held that the payments in question constituted dividends and were taxable as such and since the respondent has raised no objection to the foregoing contention of the petitioners, we hold that in a recomputation of the deficiencies the petitioners are entitled to the exclusion provided in section 116 where not already allowed with respect to dividends from other sources and to the credit provided in section 34 to the extent applicable to the payments in question. Decisions will be entered under Rule 50. Footnotes
1. Similarly, no useful purpose would be served by discussing the various (and at times conflicting) administrative rulings and announcements in this field which were promulgated in prior years. I.T. 3329, 1939-2 C.B. 153; I.T. 4027, 1950-2 C.B. 9; Rev. Rul. 58-613, 1958-2 C.B. 914↩.